1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

LUCAS REGAN,

        Plaintiff,

  v.

PINGER, INC.,

        Defendant.

Case No. 20-CV-02221-LHK

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION**

Before the Court is Defendant Pinger, Inc.'s ("Defendant") motion to dismiss and compel arbitration. ECF No. 20 ("Mot."). Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS Defendant's motion to dismiss and compel arbitration.

## I.    BACKGROUND

### A.  Factual Background

Plaintiff Lucas Regan ("Plaintiff") is a resident of Illinois. Complaint at ¶ 9, ECF No. 1 ("Compl."). Defendant Pinger is a Delaware corporation with its principle place of business in California. *Id.* at ¶ 10. Defendant develops applications ("apps") for mobile phones. Relevant to the instant case is an app Defendant developed called "Sideline." *Id.* at ¶ 20. Sideline is a paid

service that allows users to create a "virtual," alternative telephone line for their mobile phone. *Id.*

### 1. Creating a Sideline Account

To create a Sideline account a user must first download the Sideline Application ("Sideline App"). Declaration of Jocelyn Cloutier, ECF 20-1, at ¶ 25 ("Cloutier Decl."). The user is then presented with a screen instructing the user how to proceed with creating an account. The design of that screen has changed over time. *Id.* Plaintiff's complaint does not allege when Plaintiff created his first account, but Defendant's declarant attests that Plaintiff created 186 different Sideline accounts between April 23, 2016 and March 16, 2019. *Id.* at ¶ 9.

Between October 2, 2017 and March 16, 2019, the Sideline App used two different iterations of the account creation screen. In one iteration, used during the period when Plaintiff created 41 Sideline accounts, the user was presented with a screen that included a space to type in a phone number and password, and at the bottom of the screen the user could click a button labeled "CREATE ACCOUNT." Directly above the "CREATE ACCOUNT" button was a line that read "By registering, I agree to Sideline's Terms and Conditions." "Terms and Conditions" was in neon green, and the remainder of the sentence was in gray. *Id.* at ¶ 29–30. If a user clicked on the "Terms and Conditions" hyperlink, the user was brought to a page that contained the full text of the Sideline Terms of Service ("TOS"). *Id.* at ¶ 30. A screenshot of this page in color is displayed below:

Case No. 20-CV-02221-LHK
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION

United States District Court
Northern District of California

In a second iteration, used during the period when Plaintiff created 89 accounts, the user was presented with a screen that stated "To optimize your experience, tell us how you plan to use Sideline." *Id.* at ¶ 32–33. Underneath that text one button read "For Professional Use" and the other button read "For Personal Use." Below these buttons a smaller gray line of text stated "By tapping 'For Professional Use', 'For Personal Use', or 'Log in' you're agreeing to our Privacy Policy and Terms of Service." "Privacy Policy" and "Terms of Service" were in neon green font. *Id.* "Terms of Service" was hyperlinked to a page with Sideline's full TOS. *Id.* at ¶ 32. A screenshot of this page in color is displayed below:

Case No. 20-CV-02221-LHK
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION



Prior to April 23, 2016, during the period when Plaintiff created his other 56 accounts, the Sideline App used two similar screens to allow a user to create an account.  *Id.* at ¶ 34.  On these screens a user was required to input a phone number and new password into two text boxes. Underneath that information was a button labeled "Create Account."  Immediately below that button a line of text stated "By registering, I agree to Sideline's Terms & Conditions."  ECF No. 20-5 (Ex. D).  "Terms & Conditions" was hyperlinked, and the text of the hyperlink was colored turquoise.  The remainder of the text was gray.  *Id*; Cloutier Decl. at ¶ 34.  A screenshot of these pages in color is displayed below:

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

 

Finally, at various times during the period when Plaintiff used the Sideline App, the login screen for returning users contained a line between the phone number/password box and "Login" button that read "By registering, I agree to Sideline's Terms and Conditions." "Terms and Conditions" was in neon green font, and the remainder of the line was gray text. *Id.* at ¶ 37. "Terms and Conditions" was hyperlinked to a page with Sideline's full TOS. *Id.* A screenshot of this page in color is displayed below:

Case No. 20-CV-02221-LHK
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION

### 2. Arbitration Provision

From April 23, 2016 to March 16, 2019, the period during which Plaintiff created his Sideline Accounts, Sideline's TOS always contained a provision that required the user to arbitrate "any dispute" between the user and Defendant. *Id.* at ¶ 12. During this period, Sideline used four different iterations of the TOS.

The first and second iterations of the TOS contained the following identical language: "If you download an App for use in the United States . . . any dispute between you and [Defendant] shall be resolved through binding arbitration . . ." *Id.* at ¶ 21; ECF No. 20-4, at 21, 42 (Ex. C-1 and C-2). The first and second iterations of the TOS were in use between April 23, 2016 and February 5, 2018, during which time Plaintiff created his initial 76 Sideline accounts *Id.* at ¶ 20, 23.

The third and fourth iterations of the TOS contained the following identical language: "Any dispute between you and [Defendant] . . . shall be resolved through binding arbitration . . ." *Id.* at ¶ 13; ECF No. 20-3, at 24, 48 (Ex. B-1 and B-2). The third and fourth iterations of the TOS

6

also included an identical opt-out provision, which stated:

> You may opt out of arbitration by providing written notice to Pinger, Inc. at the address noted above, which must be received no later than thirty (30) calendar days from the date of your original acceptance of the license, the outbound terms and the inbound terms with this arbitration provision included. If you do not send notice as required in the foregoing sentence, you will not have opted out of arbitration.

*Id.* at ¶ 17 (original in all caps).  At no time did Plaintiff opt out of the Sideline arbitration provision.  *Id.* at ¶ 24.  The third and fourth iterations of the TOS were in use between February 6, 2018 and March 16, 2019, during which time Plaintiff created his remaining 110 Sideline accounts.  *Id.* at ¶¶ 13, 19.

### 3.  Plaintiff's Sideline Accounts

Plaintiff was a subscriber to the Sideline App, but allegedly cancelled his accounts in or around March 2019.  Compl. at ¶ 23.  According to Plaintiff's complaint, after Plaintiff cancelled his Sideline accounts Defendant began a "win-back" campaign.  This involved Defendant utilizing a computer-based dialing system to send 10-15 identical text message at midnight to urge Plaintiff to sign up for Defendant's Sideline App.  *Id.* at 25.  Each text message stated "Reply STOP to opt out of these texts," to which Plaintiff responded with a "stop" request and received a confirmation.  *Id.* at ¶¶ 26–28.  Rather than cease this practice, Defendant allegedly conducted the same text-message solicitation on 5 or 6 further occasions.  *Id.* at ¶¶ 29–30.  Plaintiff alleges that these messages were sent without Plaintiff's consent and violated Plaintiff's seclusion and caused annoyance.  *Id.* at ¶ 44.  Defendant's text messages to Plaintiff also allegedly depleted Plaintiff's cellphone battery life.  *Id.* at ¶ 46.

### B.  Procedural History

On January 22, 2020, Plaintiff filed a complaint against Defendant in Plaintiff's home district, the Northern District of Illinois, containing factual allegations identical to those in the instant case.  *See Regan v. Pinger, Inc.*, 1:20-CV-00486 (N.D. Ill Jan. 22, 2020), ECF No. 1.  On February 19, 2020, the Seventh Circuit decided *Gadelhak v. AT&T Services*, which adopted an interpretation of the Telephone Consumer Protection Act ("TCPA") that excludes text messaging

United States District Court
Northern District of California

1    platforms that do not "generate random or sequential numbers."  950 F.3d 458, 469 (7th Cir.

2    2020).  In reaching this conclusion, the Seventh Circuit declined to follow the Ninth Circuit's

3    more expansive interpretation of the TCPA in *Marks v. Crunch San Diego*, 904 F.3d 1041 (9th

4    Cir. 2018), which included such text messaging platforms.  *See Gadelhak*. 950 F.3d at 466.  On

5    the day that the Seventh Circuit announced its decision in *Gadelhak*, Plaintiff voluntarily

6    dismissed his case.  *Regan*, 1:20-CV-00486, ECF No. 18.

7         On April 1, 2020, Plaintiff filed a complaint in this district alleging that Defendant violated

8    the TCPA by sending Plaintiff text messages without Plaintiff's prior consent.  Compl. at 10.  On

9    March 21, 2020, Defendant filed the instant motion to dismiss and compel arbitration.  ECF No.

10   20 ("Mot.").

11        On June 18, 2020, Plaintiff filed a motion for leave to conduct arbitration-related

12   discovery.  ECF No. 27.  On July 2, 2020, Defendant filed an opposition to Plaintiff's motion to

13   conduct arbitration-related discovery.  ECF No. 28.  On July 10, 2020, Plaintiff filed a reply.  ECF

14   No. 31.  On July 21, 2020, United States Magistrate Judge Susan van Keulen granted in part

15   Plaintiff's motion for leave to conduct arbitration-related discovery.  ECF No. 33.

16        On August 4, 2020, Defendant filed a motion for relief from Judge van Keulen's order

17   granting leave to conduct arbitration-related discovery.  ECF No. 37.  On August 6, 2020, the

18   Court denied Defendant's motion for relief.  ECF No. 38.

19        On October 5, 2020, Plaintiff filed an opposition to Defendant's motion to dismiss and

20   compel arbitration.  ECF No. 58.  On October 30, 2020, Defendant filed a reply.  ECF No. 62.

21   **II.    LEGAL STANDARD**

22        The Federal Arbitration Act ("FAA") applies to arbitration agreements in any contract

23   affecting interstate commerce.  *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001).

24   If all claims in the case are subject to a valid arbitration agreement, the Court may dismiss or stay

25   the case.  *See Hopkins & Carley, ALC v. Thomson Elite*, 2011 WL 1327359, at *7–8 (N.D. Cal.

26   Apr. 6, 2011).

27        The interpretation of an arbitration agreement generally turns on state law.  *See Arthur*

28
Case No. 20-CV-02221-LHK
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION

*United States District Court*
*Northern District of California*

*Anderson LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009).  However, the United States Supreme Court has stated that "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute," and that "[t]he court is to make this determination by applying the federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act."  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

Whether a dispute is arbitrable under federal law turns on two questions: (1) whether the parties agreed to arbitrate; and, if so, (2) whether the scope of the agreement to arbitrate encompasses the claims at issue.  *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).  When deciding whether the parties agreed to arbitrate a certain matter, courts generally apply ordinary state law principles of contract interpretation.  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Thus, in determining whether parties have agreed to arbitrate a dispute, the Court applies "general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration."  *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir. 2009) (quoting *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996)).  As such, "[t]he standard for demonstrating arbitrability is not a high one; in fact, a district court has little discretion to deny an arbitration motion, since the [FAA] is phrased in mandatory terms."  *Republic of Nicar. v. Std. Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991).

## III.   DISCUSSION

According to Defendant, Plaintiff's claim is subject to arbitration pursuant to the arbitration provision contained within the Sideline TOS.  In opposition, Plaintiff disputes that his claim is subject to arbitration for two reasons.  First, Plaintiff contends that he never agreed to the TOS on the Sideline App.  Second, Plaintiff contends that, even assuming he did agree to the TOS, the arbitration provision contained within the TOS does not apply to Plaintiff's claim under the TCPA.  The Court considers these arguments in turn.

### A.  Whether Plaintiff Agreed to the Sideline Application's Terms of Service

9

United States District Court
Northern District of California

1    Plaintiff first contends that he did not agree to the Sideline TOS when he created an

2 account on the Sideline App.  Opp. at 4.  "Before a party to a lawsuit can be ordered to arbitrate

3 and thus be deprived of a day in court, there should be an express, unequivocal agreement to that

4 effect.  Only when there is no genuine issue of fact concerning the formation of the agreement

5 should the court decide as a matter of law that the parties did or did not enter into such an

6 agreement." *Cordes v. Uber Tech.*, 228 F. Supp. 3d 985, 988 (N.D. Cal. 2017) (quoting *Three*

7 *Valleys Mun. Water Dist. V.E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)).

8 Importantly, "[q]uestions of contract formation are questions of state law," and in California,

9 "mutual assent is the key to contract formation."  *Id.*

10    Both parties agree that this case implicates the law of internet-based contract formation.

11 "Contracts formed on the Internet come primarily in two flavors: 'clickwrap' (or 'click-through')

12 agreements, in which website users are required to click on an 'I agree' box after being presented

13 with a list of terms and conditions of use; and 'browsewrap' agreements, where a website's terms

14 and conditions of use are generally posted on the website via a hyperlink at the bottom of the

15 screen." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014).  Importantly,

16 "[u]nlike a clickwrap agreement, a browsewrap agreement does not require the user to manifest

17 assent to the terms and conditions expressly . . . [a] party instead gives his assent simply by using

18 the website." *Id.* (internal quotation marks omitted).  "Indeed, 'in a pure-form browsewrap

19 agreement, the website will contain a notice that—by merely using the services of, obtaining

20 information from, or initiating applications within the website—the user is agreeing to and is

21 bound by the site's terms of service.'" *Id.* (quoting *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829,

22 837 (S.D.N.Y. 2012)).  "[B]y visiting the website—something that the user has already done—the

23 user agrees to the Terms of Use not listed on the site itself but available only by clicking a

24 hyperlink." *Id.* (internal quotations and citation removed).  Thus, the "validity of [a] browsewrap

25 contract depends on whether the user has actual or constructive knowledge of a website's terms

26 and conditions." *Id.*  Thus, whether there is a valid agreement "turns on whether the website puts

27 a reasonably prudent user on inquiry notice of the terms of the contract," which in turn "depends

28

Case No. 20-CV-02221-LHK
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION

on the design and content of the website." *Id.* at 1177.

Plaintiff contends that the Sideline App uses a browsewrap agreement that did not provide sufficient notice to Plaintiff of the terms of the contract, and therefore that Plaintiff did not assent to the TOS. Opp. at 5. Defendant, by contrast, eschews the distinction between browsewrap and clickwrap agreements and instead focuses on the proximity and clarity of the TOS notification on the Sideline App's account creation page. Mot. at 15. In order to determine whether the parties manifested mutual assent, the Court first reviews the process of creating an account on the Sideline App. The Court then considers whether the Sideline TOS are properly described as a browsewrap or clickwrap agreement. Finally, the Court considers whether Plaintiff assented to the TOS by creating an account on the Sideline App.

### 1. Creating an Account

As the Court has already described, the process of creating an account on the Sideline App varied over the period Plaintiff created 186 Sideline accounts. *See* Cloutier Decl. at ¶¶ 9, 28.

When Plaintiff created 130 of his Sideline accounts Plaintiff was shown one of two screens. *Id.* at ¶ 28. When Plaintiff created 41 of these accounts, Plaintiff was shown a screen that required Plaintiff to input his phone number and a password in two entry boxes. Underneath those boxes, and above the "Create Account" button, a line of text stated "By registering, I agree to Sideline's Terms and Conditions." The bulk of this text was written in gray, with the hyperlinked "Terms and Conditions" colored neon green. *Id.* at ¶ 29.

When Plaintiff created a further 89 accounts, Plaintiff was shown a screen that stated: "To optimize your experience, tell us how you plan to use Sideline." Underneath this text there were two buttons Plaintiff could click, one which read "For Professional Use" and another that read "For Personal Use." Beneath these boxes a line of text stated "By tapping 'For Professional Use', 'For Personal Use', or 'Log in' you're agreeing to our Privacy Policy and Terms of Service." *Id.* at ¶ 32. The bulk of this text was in gray, with the hyperlinked "Privacy Policy" and "Terms of Service" in neon green. *Id.*

When Plaintiff created his remaining 56 Sideline accounts, he was shown one of two

11

United States District Court
Northern District of California

1    almost identical screens. *Id.* at ¶ 34. On these screens Plaintiff was required to input a phone

2    number and new password. Underneath that information was a button labeled "Create Account."

3    Immediately below that button a line of text stated: "By registering, I agree to Sideline's Terms &

4    Conditions." ECF No. 20-5 (Ex. D). "Terms & Conditions" was hyperlinked and turquoise

5    colored. The remainder of the text was gray. *Id.*

6        Moreover, during the period in which Plaintiff used the Sideline App, Plaintiff was

7    periodically reminded of his consent to the TOS by the Sideline App's login screen, which

8    contained a line of text beneath the "Login" button that stated "By registering, I agree to Sideline's

9    Terms and Conditions." The bulk of this text was in gray, but the hyperlinked "Terms and

10   Conditions" was in neon green. *Id.* at ¶ 36–37.

11       **2. Browsewrap or Clickwrap**

12       Given the process for creating an account on the Sideline App described above, the Court

13   finds that the Sideline TOS is neither a "true browsewrap agreement" nor a "pure-form clickwrap

14   agreement." *See Nevarez v. Forty Niners Football Company, Inc.*, 2017 WL 3492110, at *7 (N.D.

15   Cal. Aug. 15, 2017) (explaining a middle-ground between these approaches).

16       Unlike a true browsewrap agreement—in which a user purportedly assents to terms of

17   service merely by browsing a website— a user of the Sideline App had to take an affirmative

18   action to agree to the Sideline TOS when the user created an account and often when the user

19   logged back into the Sideline App. Thus, a user of the Sideline App had to make at least one, and

20   sometimes two, affirmative acknowledgments that the user was agreeing to the Sideline TOS by

21   creating an account. Mot. at 13; Cloutier Decl. at ¶¶ 29, 32, 37.

22       However, the Sideline TOS are also not a "pure-form clickwrap agreement." *Fteja*, 841 F.

23   Supp. 2d at 836–37; *see also Nevarez*, 2017 WL 3492110, at *8 (same). In a pure-form clickwrap

24   agreement, "users typically click an 'I agree' box after being presented with a list of terms and

25   conditions of use." *Id.* A user of the Sideline App, by contrast, was not forced to actually read the

26   TOS before assenting to them. Moreover, a Sideline user did not click a button labeled "I agree"

27   when they assented to the TOS. Instead, a user clicked buttons for actions like "Create Account,"

28

Case No. 20-CV-02221-LHK
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION

United States District Court
Northern District of California

"For Personal Use," or "Login," and those buttons did not explicitly reference the TOS. *See Nevarez*, 2017 WL 3492110, at *8 (explaining distinction between buttons that explicitly reference assent and those that do not). Accordingly, the Sideline App does not use a pure clickwrap agreement, whereby users "are presented with the proposed license terms and forced to expressly and unambiguously manifest either assent or rejection prior to being given access to the product." *Fteja*, 841 F. Supp. 2d at 836.

As such, the Court finds that the Sideline App's TOS are somewhere between a pure clickwrap agreement and a pure browsewrap agreement. Courts now sometimes refer to these hybrid approaches as "sign-in wrap" agreements, whereby a website "notif[ies] the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advise[s] the user that he or she is agreeing to the terms of service when registering or signing up." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75–76 (2d Cir. 2017); *see also Peter v. Doordash, Inc.*, 445 F. Supp. 3d 580, 585–586 (N.D. Cal. 2020) (noting this hybrid approach and finding arbitration agreement enforceable on a similar set of facts).

Regardless of the precise label, based on the design and function of the Sideline App, the Court finds that Plaintiff assented to the Sideline TOS by creating an account. As the Court has already explained, the Sideline App sufficiently informed Plaintiff either (1) that by creating an account the user agreed to Sideline's TOS, or (2) that by clicking the "Create Account," "For Professional Use," "For Personal Use," or "Login" button, Plaintiff was agreeing to the Sideline TOS. *See* Cloutier Decl. at ¶¶ 29, 32 34. Plaintiff was also repeatedly reminded that he agreed to the TOS by creating an account when Plaintiff clicked the "Login" button upon returning to use the Sideline App. *Id.* at 37. As such, when Plaintiff created each account, Plaintiff assented to the Sideline TOS by creating that account.

This determination is consistent with the decisions of numerous courts in this circuit that have concluded that disclosures similar to Defendant's provided users with sufficient notice to manifest mutual assent to the website's terms of service. *See, e.g., Doordash,* 445 F. Supp 3d at 585 (enforcing arbitration clause where hyperlinked terms and conditions was in a contrasting

13

color and located near the "Sign In" button); *Harbers v. Eddie Bauer, LLC*, 2019 WL 6130822, at *8 (W.D. Wash. Nov. 19, 2019) (enforcing arbitration clause contained within terms of service where user clicked "Submit Order" button above hyperlinked text that read "By ordering you agree to eddiebauer.com's Privacy Policy and Terms of Use"); *Dupler v. Orbitz, LLC*, 2018 WL 6038309, at *3 (C.D. Cal. July 5, 2018) (enforcing arbitration clause where text putting a user on notice of the terms of use was located directly above the "Complete Booking" button); and *Nevarez*, 2017 WL 3492110, at *8 (enforcing arbitration clause contained within terms of use where users agreed to the terms of use by clicking on "Accept and Continue" or "Sign In," and the terms were hyperlinked and located nearby).

Plaintiff argues that the facts in the instant case are more analogous to those in *Nguyen v. Barnes & Noble Inc.*, and therefore the arbitration provision within the Sideline TOS should not be enforced. 763 F.3d at 1171; Opp. at 5–6. However, the facts in *Nguyen* only serve to demonstrate the distinction between a pure browsewrap agreement and the Sideline TOS at issue in the instant case. In *Nguyen*, the Ninth Circuit noted that the terms of use for the defendant's website were "available via a conspicuous hyperlink on every page of the website." *Id.* at 1179. The Court went on to explain, however, that the defendant's website "otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent," and that as such, "even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Id.*

By contrast, in the instant case, the Sideline App not only included notice of the TOS via a hyperlink in close proximity to the relevant action button, but the text of the notice itself further informed Plaintiff that by registering an account or clicking a button Plaintiff was consenting to the Sideline TOS. This further notice distinguishes the instant case from *Nguyen*, in which the Ninth Circuit considered a website with only the hyperlinked terms of service available at the bottom of each page, but provided no further notice that proceeding on the website would constitute acceptance of the terms of service. *Id.* at 1177 (acknowledging that "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent

14

United States District Court
Northern District of California

to be bound, courts have been more amenable to enforcing browsewrap agreements.").

Importantly, Plaintiff does not cite any case from this circuit with similar facts that support Plaintiff's argument that defendant's arbitration agreement is not enforceable. Instead, Plaintiff primarily cites out of circuit, inapposite decisions that courts within the Ninth Circuit have not followed. *See, e.g., Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 64 (1st Cir. 2018) (insufficient notice of terms of service where notice was inconspicuous); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016) (arbitration clause was not enforceable where disclosure was inconspicuous in the context of the page). In contrast to these out of circuit decisions, Defendant's notice of the TOS was clearly conspicuous and is therefore enforceable. Moreover, courts within the Ninth Circuit have not followed either decision.

The remaining in-circuit cases that Plaintiff cites are either distinguishable or support Defendant's argument. In *McKee v. Audible, Inc.*, the court found that the arbitration provision at issue was not enforceable for several reasons, including (1) the first disclosure that a user was shown lacked hyperlinks to the terms of service and was in "small, undifferentiated font"; (2) further disclosures required the user to scroll down on an iPhone and the user could click the "Start Now" button without scrolling down; and (3) the notice of the terms of service referred to "making a purchase," but plaintiff did not make a purchase. 2017 WL 4685039, at *8–10. (C.D. Cal. July 17, 2017). In the instant case, by contrast, Plaintiff was shown a conspicuous notice of the TOS that was in close proximity to the relevant action button and was hyperlinked, and Plaintiff clicked through the create account screen and created 186 Sideline accounts.

In *Weiman Chen v. Sierra Trading Post*, Plaintiff's other in-circuit case, the court found that the hyperlinked notice of the terms of service was enforceable because it was capitalized and underlined and thus "distinguishable from the surrounding text." 2019 WL 3564659, at *3 (W.D. Wash. Aug. 6, 2019). In the instant case, the notice of the TOS was capitalized and set off from the surrounding text by brightly colored front and thus "distinguishable from the surrounding text." *Id.* As such, Plaintiff has not provided any case from this circuit that supports his argument that he did not agree to the Sideline TOS.

15

### 3. Discrepancy in Language

Finally, Plaintiff argues that Plaintiff did not assent to the TOS on the Sideline App because in one iteration the Sideline App stated: "By registering, I agree to Sideline's Terms and Conditions," but the corresponding button directly next to the text read "Create Account." Opp. at 9–10; *see* Cloutier Decl. at ¶ 29. Plaintiff argues that "creating an account" is only the first step in the registration process of a Sideline account, and therefore Plaintiff did not know that by clicking the "Create Account" button Plaintiff would assent to the Sideline TOS. *Id.* However, as Defendant argues, the Sideline App appears to often use the terms "create" and "register" interchangeably, and therefore there is no difference between creating and registering an account. Reply at 6–7; *see also* ECF No. 20-3 at 7–9 (providing examples of this use).

Moreover, the Second Circuit held that a website user had sufficient notice of the terms of service on a set of facts almost identical to those at issue in the instant case. The Second Circuit explained that "[a]lthough the warning text used the term 'creat[e]' instead of 'register,' as the button was marked, the physical proximity of the notice to the register button and the placement of the language in the registration flow make clear to the user that the linked terms pertain to the action the user is about to take." *Meyer*, 868 F.3d at 80. The Court agrees with this reasoning and finds that the disclosure alerting Plaintiff that "By registering, I agree to Sideline's Terms and Conditions," located immediately above the "Create Account" button, was sufficient notice that Plaintiff would be bound by the Sideline TOS when Plaintiff clicked the "Create Account" button.

Plaintiff cites three cases that Plaintiff argues stand for the proposition that Plaintiff was not put on sufficient notice of the TOS by clicking "Create Account" because the purported notice referenced creating an account. Opp. at 10. However, Plaintiff's cases are inapposite. In *McKee v. Audible*, the court found that plaintiff was not bound by the terms of service at issue because the website's disclosure stated that "'making' a 'purchase' binds the user to Audible's [terms of use]," but plaintiff only clicked the adjacent "Start Now" button above the disclosure and did not make a purchase. 2017 WL 4685039, at *8. In the instant case, by contrast, Plaintiff went through the full process of creating and using an account more than one hundred times. Mot. at 3.

16

United States District Court
Northern District of California

United States District Court
Northern District of California

1       In *Weber v. Amazon.com*, the court found that a user was not put on constructive notice of

2   the terms of use where a webpage contained an initial "Place your Order" button at the top of the

3   page with a disclosure above it, but then the user had to fill out several sections of vital

4   information below, after which the user was presented with a second "Place Your Order" button.

5   This second button did not include a disclosure nearby, and plaintiff pressed this second button,

6   rather than scrolling up to the top to press the first.  2018 WL 6016975, at *10-11 (C.D. Cal. June

7   4, 2018).  In the instant case, by contrast, Plaintiff was presented with only one button, and that

8   button was immediately adjacent to the applicable disclosure of the Sideline TOS.

9       Finally, in *Wilson v. Playtika*, the court found that plaintiff was not bound by terms of use

10  because the website used a pure browsewrap agreement, whereby the terms of service hyperlink

11  was not paired with any text indicating that clicking "Continue" manifested the user's assent to the

12  website's terms.  349 F. Supp. 3d 1028, 1038 (W.D. Wash. 2018).  Rather, the website interface

13  buried the terms of service hyperlink at the bottom of the page, away from the button and with no

14  text indicating that clicking "Continue" bound a user to the terms of service.  *Id.*  Accordingly,

15  none of these cases support Plaintiff's argument that Plaintiff was not put on sufficient notice that

16  he was consenting to the TOS by a disclosure that read "By registering, I agree to Sideline's

17  Terms and Conditions," located immediately above the "Create Account" button.

18      Accordingly, the Court finds that Plaintiff assented to the Sideline TOS when Plaintiff

19  created his 186 Sideline accounts between April 23, 2016 and March 16, 2019, and thus Plaintiff

20  assented to the arbitration provision contained within the Sideline TOS.

21      **B. Whether Plaintiff's Claim is Subject to the Arbitration Provision**

22      Having concluded that Plaintiff assented to the Sideline TOS, and thus assented to the

23  arbitration provision contained within the Sideline TOS, the remaining question before the Court

24  is whether that arbitration provision governs the instant dispute between the parties.

25      Given the strong federal policy favoring arbitration, "any doubts concerning the scope of

26  arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Memorial Hosp. v.*

27  *Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).  Accordingly, "arbitration should only be

28

17

1   denied where it may be said with positive assurance that the arbitration clause is not susceptible of

2   an interpretation that covers the asserted dispute." *AT&T Tech., Inc. v. Commc'n Workers*, 475

3   U.S. 643, 650 (1986) (internal quotation marks omitted).  Moreover, this presumption in favor of

4   arbitration is "particularly applicable" where the arbitration clause is broadly worded.  *Id.*

5           Defendant argues that given the extremely broad language shared by the operative Sideline

6   TOS, which require that Plaintiff and Defendant arbitrate "any dispute" between the parties,

7   Plaintiff's TCPA claim is clearly covered by, and subject to, the arbitration provision in the

8   Sideline TOS.  Mot. at 15–16.  Plaintiff argues in opposition that under both California contract

9   law and Ninth Circuit precedent a party cannot be compelled to arbitrate a claim that bears no

10  relation to the underlying contract between the parties.  Opp. at 14.

11          The Court agrees with Plaintiff that under California contract law even broad contractual

12  language compelling arbitration covers only those disputes that "have their roots in the

13  relationship between the parties which was created by the contract."  *Rice v. Downs*, 248 Cal. App.

14  4th 175, 188 (Cal. Ct. App. 2016).  However, the Ninth Circuit has clarified that where an

15  arbitration clause includes broad contractual language, Plaintiff's "allegation need only 'touch

16  matters' covered by the contract containing the arbitration clause and all doubts are to be resolved

17  in favor of arbitrability."  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999); *see also*

18  *Parish v. Fitness Intern., LCC*, 2020 WL 5371510, at *4 (C.D. Cal. June 10, 2020) (noting that

19  "'sweeping language' like 'any dispute' covers a broad range of disputes that may arise between

20  parties to an arbitration agreement, even those that may arise outside of the agreement.").

21          Courts around the country have considered whether broad contractual language compelling

22  arbitration covers claims brought under the TCPA and have reached conflicting conclusions.  *See,*

23  *e.g., Breda v. Cellco P'ship*, 934 F.3d 1, 8 (1st Cir. 2019) (motion to compel arbitration was

24  correctly denied because plaintiff's TCPA claims were entirely unrelated to the previous

25  contractual relationship between the parties); *Augustine v. TLC Resorts Vacation Club, LLC*, 2018

26  WL 3913923, at *8 (S.D. Cal. Aug. 16, 2018) (TCPA claim arising out of text messages

27  addressing unpaid dues was subject to arbitration "[g]iven the circumstances of this case and the

28
Case No. 20-CV-02221-LHK
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION

plain, broad language of the arbitration provision, as well as the strong presumption in favor of arbitration."); and *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016) (TCPA claim stemming from unsolicited calls and text messages from defendant were not sufficiently related to contract formed between plaintiff and defendant's corporate-affiliate to be subject to the arbitration clause in that contract).

Moreover, district courts within this circuit have reached conflicting conclusions regarding whether TCPA claims fall within the scope of broad arbitration provisions, depending on the facts of the case and the nature of the underlying contract. For example, in *In re Jiffy Lube Int'l Inc. Text Spam Litigation*, plaintiff signed a contract with defendant containing an arbitration agreement when plaintiff purchased an oil change. 847 F. Supp. 2d 1253, 1262 (S.D. Cal. 2012) ("*In re Jiffy Lube*"). Defendant later sent plaintiff text messages offering membership in a club that provided discounts on oil changes. *Id.* at 1263. Plaintiff brought a TCPA claim on the basis of these text messages, and defendant moved to compel arbitration. The court denied the motion to compel arbitration because the court found that the later text messages were insufficiently connected to the earlier contractual agreement for a single oil change. *Id.*

By contrast, in *Parish v. Fitness International, LLC*, plaintiff signed a contract for a gym membership that contained an arbitration provision similar to the one at issue in the instant case. 2020 WL 5371510, at *1. Plaintiff made one payment under the contract, but then failed to make further payments. *Id.* Defendant later sent plaintiff text messages offering an enrollment fee waiver and other discounts. Plaintiff brought a TCPA claim on the basis of these text messages, and defendant moved to compel arbitration. *Id.* The court found that plaintiff's TCPA claims were subject to arbitration under the contract because the broad "any dispute" language of the contract's arbitration clause covered even conduct that fell outside of the contractual agreement. *Id.* at *4. Plaintiff argues that the instant case is analogous to *In re Jiffy Lube Int'l* and that "[t]he barrage of text messages Plaintiff received have no relationship with his use of the Sideline Account. Instead, Plaintiff received those messages after he terminated his subscription and instructed Pinger to stop contacting him." Opp. at 15.

19

United States District Court
Northern District of California

1    Neither of these arguments are convincing.  First, Defendant asserts that Pinger's records

2 demonstrate that Plaintiff failed to close 2 of his 186 Sideline accounts, including the final account

3 that Plaintiff opened on March 16, 2019.  Cloutier Decl. at ¶ 11; *Macias v. Excel Bldg. Serv. LLC*,

4 767 F. Supp. 2d 1002, 1007 (N.D. Cal. 2011) ("In deciding a motion to compel arbitration, [the

5 court] may consider the pleadings, documents of uncontested validity, and affidavits submitted by

6 either party." (internal citation and quotation marks omitted)); *Concat LP v. Unilever, PLC*, 350 F.

7 Supp. 2d 796, 804 (N.D. Cal. 2004) (noting that on a motion to compel a court may consider

8 evidence outside the pleadings, such as declarations, using "a standard similar to the summary

9 judgment standard of [Federal Rule of Civil Procedure 56].").   Plaintiff has not disputed this

10 assertion.

11    Second, as Defendant argues, the Sideline TOS bear directly on Plaintiff's TCPA claim.

12 Specifically, the Sideline TOS provide that "For Sideline Accounts, you agree that [Pinger] may

13 contact you at the mobile phone number you provide during registration about your Account

14 and/or about setting up an Account."  ECF No. 20-3 at 8, 52.  Thus, in the instant case, unlike in *In

15 re Jiffy Lube*, Defendant's communications with Plaintiff via Plaintiff's mobile number were

16 expressly envisioned by the contract between the parties.

17    Moreover, Defendant's text messages to Plaintiff's mobile number are directly related to

18 the contract between the parties.  Plaintiff used his mobile number to create his Sideline accounts,

19 and the Sideline App requires users to utilize their mobile number to operate the Sideline app.

20 Thus, Plaintiff's mobile number and corresponding limitations on how Defendant may use and

21 communicate with that number are directly connected to the contract between the parties.

22    However, on the record before the Court, whether Plaintiff's TCPA claim falls within the

23 scope of the Sideline App's arbitration provision is a close question.  Two considerations

24 ultimately compel the Court to find that Plaintiff's TCPA claim is covered by the arbitration

25 provision.  First, the facts of this case are closer to those of *Parish* than *In re Jiffy Lube*.  The

26 underlying contract in *In re Jiffy Lube* concerned a one-time transaction, and the only connection

27 between the contract and the text messages to plaintiff was that plaintiff likely provided his

28

United States District Court
Northern District of California

United States District Court
Northern District of California

telephone number when he signed the contract.  847 F. Supp. 2d at 1263 (explaining that arbitration provision in oil change contract did not cover Plaintiff's TCPA claim).  By contrast, in the instant case, like in *Parish*, the parties had an extended contractual relationship that may have remained ongoing at the time of the allegedly nonconsensual contact by Defendant.  As such, the instant case is more like previous cases in this circuit where courts have found that a TCPA claim fell within the scope of a contract's arbitration provision.  *See, e.g., Parish*, 2020 WL 5371510, at *4 (TCPA claim covered by arbitration provision); *Augustine*, 2018 WL 3913923, at *8 (TCPA claim arising out of text messages concerning unpaid dues was subject to arbitration).

Second, the United States Supreme Court has repeatedly admonished courts that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24–25; *see also AT&T Tech.*, 475 U.S. at 650 (explaining that "arbitration should only be denied where it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." (internal quotation marks omitted)).  The Court follows the United States Supreme Court's clear directive and finds that the scope of the Sideline TOS's arbitration provision encompasses Plaintiff's TCPA claim.  *Id*; *see also Brennan*, 796 F.3d at 1130 (claim is subject to arbitration where the scope of the agreement to arbitrate encompasses the claims at issue).

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion to compel arbitration is GRANTED. Plaintiff's claim against Defendant is dismissed without prejudice.  *See Sparling v. Hoffmann Constr. Co.*, 864 F.2d 635, 638 (9th Cir. 1988) (explaining that when arbitration is mandatory, the court has discretion to stay or dismiss the case); *Nevarez*, 2017 WL 34 92110, at *15 (dismissing claims without prejudice where arbitration of plaintiffs' claims was mandatory and the parties did not raise any reason for why a stay was more appropriate).

**IT IS SO ORDERED.**

Dated: February 23, 2021

*Lucy H. Koh*
_____

21

Case No. 20-CV-02221-LHK
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION

1

LUCY H. KOH
United States District Judge

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

22